UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| IN RE: ) | |
| ) | |
| ) | |
| ) | 2:13-cv-00405-JMS-MJD |
| ELEANOR SHAFER and RHONDA L. KNIGHT, ) | |
| *Defendants.* ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court conducted a bench trial in this action on October 28, 2014 in Terre Haute, Indiana. *Pro se* Defendants Eleanor Shafer and Rhonda L. Knight both appeared in person.

This action involves a determination of who is entitled to life insurance benefits which became due when James Shafer, an employee of Novelis Corporation ("Novelis"), passed away after a lengthy illness. As is often the case, disputes over the appropriate care of a sick family member can cause turmoil within a family. Such a dispute has given rise to the issues presented to this Court.

This action began when Metropolitan Life Insurance Company ("MetLife") filed a Complaint in Interpleader on November 21, 2013. [Filing No. 1.] MetLife alleged that it funded the Novelis Life Insurance Benefits Plan ("the Plan"), which is an employee welfare benefit plan, through a group life insurance policy it issued. [Filing No. 1 at 2.] MetLife further alleged that James Shafer was an employee of Novelis and a participant in the Plan. [Filing No. 1 at 2.] The two interpleader defendants – Ms. Shafer, who is Mr. Shafer's ex-wife, and Ms. Knight, who is Mr. Shafer's daughter – each claim that they are entitled to the life insurance policy benefits (the "Plan Benefits"), which total $10,000. [Filing No. 1 at 3-4.] MetLife requested that it be permitted

to pay into the Clerk of the Court the Plan Benefits, plus applicable interest, so the Court can determine to whom the Plan Benefits are owed. [Filing No. 1 at 5-6.]

On February 10, 2014, MetLife filed a Motion for Interpleader, requesting that it be permitted to pay the Plan Benefits to the Clerk of the Court and that it be dismissed from the action. [Filing No. 12.] On March 28, 2014, the Court granted MetLife's Motion for Interpleader, finding that "MetLife is merely a stakeholder and claims no beneficial interest in the life insurance benefits payable under the Plan," and that "MetLife had not voluntarily made payment of the life insurance benefits payable under the Plan because MetLife could not determine the proper beneficiary or beneficiaries without risking exposure of itself, the Plan, or the Plan sponsor to the possibility of multiple payments of the life insurance benefits which are due." [Filing No. 17 at 2.] The Court permitted MetLife to tender the Plan Benefits to the Clerk of the Court, dismissed MetLife from the action, and discharged MetLife, the Plan, and Novelis from any liability to Mr. Shafer, Ms. Shafer, or Ms. Knight. [Filing No. 17 at 2-3.]

The Court held a bench trial on October 28, 2014 to determine who is entitled to the Plan Benefits. The Court now issues its findings of fact and conclusions of law which resulted from the bench trial.

## I.
## FINDINGS OF FACT[1]

### A. Jurisdiction

At the outset, the Court finds that it has subject-matter jurisdiction over this matter. The Plan Benefits that are the subject of the interpleader are governed by the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA"). Accordingly, the

---

[1] Any finding of fact should be deemed a conclusion of law to the extent necessary and vice versa.

Court has subject-matter jurisdiction under 29 U.S.C. § 1132 and 28 U.S.C. § 1331. *See Life Ins. Co. of North America v. Camm*, 2007 WL 2316480, * 2 (S.D. Ind. 2007) (two interpleader actions filed by life insurance company to determine who was entitled to life insurance benefits under plan governed by ERISA were within federal court's federal question jurisdiction "because the disputes are over employee benefits subject to ERISA. This case falls squarely within the court's federal question jurisdiction"); *Metro. Life Ins. Co. v. Bryan*, 2005 U.S. Dist. LEXIS 6575, *3-4 (N.D. Ind. 2005) ("The Court has federal question jurisdiction in this case. Pursuant to 29 U.S.C. § 1132(a)(3)(B)(ii), a pension plan administrator – who qualifies as an ERISA fiduciary… – may seek to obtain equitable relief to enforce the terms of a plan. Plaintiff in this case filed an interpleader action to determine the rightful recipient of the pension benefits at issue, an equitable procedure").

### B. The Initial Beneficiary Designation

MetLife issued a group term life insurance policy with Group Policy Number 6299-G to Novelis. Mr. Shafer was employed by Novelis and, accordingly, was covered by the life insurance policy. On November 17, 1982, Mr. Shaffer designated Ms. Shafer, his then-wife, as the beneficiary of the Plan Benefits under the life insurance policy. This change removed Mr. Shafer's first wife, and the mother of his children, as the policy beneficiary.

### C. Mr. Shafer's Health Begins to Decline

Mr. Shafer retired and was eventually diagnosed with Parkinson's Disease and Alzheimer's Disease. The parties submitted various medical records relating to treatment beginning in August 2011, including:

- August 10, 2011: Mr. Shafer was seen in the hospital by Dr. John Hubbard for "confusion." Dr. Hubbard noted that Mr. Shafer had "[q]uestionable acute to subacute left-sided posterior limb internal capsule lacunar infarct. With age

related involutional changes, findings compatible with chronic microvascular white matter ischemic change."

- August 26, 2011: Mr. Shafer was examined by Dr. Todd Carpenter. Dr. Carpenter stated that Mr. Shafer "was admitted on 8/10/2011 with increased confusion, falls, and restlessness. He has a history of Parkinson's disease and Alzheimer's dementia. He is considering signing power of attorney for financial matters over to his daughter. Consequently, a competency evaluation was requested." Mr. Shafer scored 13 on the Folstein Mini-Mental Status Exam, and a normal range for an individual of his age with a high school education is between 27 and 30. Dr. Carpenter noted that the score of 13 "indicat[ed] significant cognitive impairments." Dr. Carpenter stated "James Shafer is displaying significant cognitive impairments in multiple domains. For instance, significant impairments were found in his immediate, recent and remote memory, general fund of knowledge, attention, and constructional abilities. He was disoriented and displayed severe memory difficulties. For instance, he thought the year was 1013, believed he was at 'Anthony's Hospital,' did not know his date of birth, and was unable to recall how many children he had. It is my opinion, at this time, that: 1. He lacks the capacity to fully understand information relevant to this decision regarding power of attorney, and 2. He does not grasp the potential ramifications of his choices, but simply what he has been told by family. Consequently, it is felt that he is unable to make an informed decision at this time due to his severe cognitive impairments. However, he can be evaluated again at a later date if it is felt that his cognitive functioning has improved."

- September 9, 2011: Dr. Hans Andreasen examined Mr. Shafer in the hospital and summarized his history, stating "The patient is a well known, 79-year-old white male who has been declining with Parkinson's disease and vascular dementia despite outpatient treatment. He had been in with a question of a small cerebral vascular accident but mostly exacerbation of Parkinson's symptoms with extrapyramidal reactions from his medications. He was on Medical Rehabilitation Unit and would have periods of confusion and agitation, but he went to [a nursing home] and did very poorly there. He became agitated, combative. He was sedated and sent to the emergency room. He ended up at [a mental health facility]. There, despite medication changes he became worse and he was sent to the Emergency Room at Regional Hospital. They observed him overnight, but when he needed hospitalization he was transferred here to our care. Here, with all of his sedative medications held, he has improved, although he still has significant Parkinson's symptoms and gets confused and mild agitation at night." Dr. Andreasen also noted "[h]e had reached the point where it was felt that he could continue receiving care at the nursing home. Arrangements will be made for him to be discharged to the nursing home…."

- September 15, 2011: Dr. Steven Maynard wrote a letter stating "Mr. Shafer has a medical condition in which he is not capable of making financial or other decisions on his own behalf."

- September 19, 2011: Dr. Lingan Sidda stated in a report that Mr. Shafer was being examined for "altered mental status," and that he had "[a]ge related brain atrophy with small vessel ischemic changes in both periventricular and deep white matter. If symptoms persist, MRI would be of benefit for further evaluation."

- September 21, 2011: Dr. Maynard wrote a letter stating "Mr. Shafer has a diagnosis of Alzheimer's Disease. As a result [of] this condition, he is not capable of making financial or other decisions on his own behalf as of February 2011."

- September 24, 2011: Dr. Andreasen examined Mr. Shafer in the hospital and stated "[h]e was taken out of the nursing home by his family to an outing where he had a syncopal episode where he became weak. He was found to be bradycardic with a heart rate down in the 30's with observation." The record reflects that Mr. Shafer received a pacemaker, and was discharged to a nursing home.

The decision was made to place Mr. Shafer in a nursing home, and Ms. Knight suggested the particular facility, with Ms. Shafer's agreement. Ms. Knight soon came to regret her choice. While Mr. Shafer was a resident at the nursing home, Ms. Knight and Ms. Shafer disagreed regarding the quality of care that he was receiving and whether he should remain there.[2] Ms. Shafer did not believe she could take care of him on her own, so wanted him to rehabilitate in the

---

[2] The Court notes that there are only two legal issues presented in this case – whether the Power of Attorney was valid, and, if so, whether it could be used to validly change the beneficiary of the Plan Benefits. Given the hard feelings between the parties, each presented evidence related to issues such as the care Mr. Shafer received while living with Ms. Shafer, whether Ms. Shafer was permitted to visit Mr. Shafer at various points, and how much time Ms. Shafer and Ms. Knight spent with Mr. Shafer during his hospitalizations. This evidence provided background as to the parties' relationships with each other and Mr. Shafer, and was relevant to the issues of bias and motive, as each party seemed to be accusing the other of seeking financial gain in their dealings with Mr. Shafer. It is the Court's view that Mr. Shafer was loved by all of his family – wife and children – and that there was sincere disagreement about his care. The parties' evidence of past interactions with Mr. Shafer was therefore not directly relevant to determining the key issues raised in this action, which were instead resolved by consideration of testimony and evidence from independent witnesses.

nursing home first. Ms. Knight did not think Mr. Shafer was receiving adequate care in the nursing home, and offered either to move in with Mr. and Ms. Shafer, or to have Mr. Shafer move in to her house so she could care for him. Ms. Shafer refused Ms. Knight's offers, and believed he should stay at the nursing home until he had improved. Mr. Shafer's other children, like Ms. Knight, also believed that he was not receiving adequate care at the nursing home. Theresa Booker, Mr. Shafer's daughter, noted that he sometimes would sleep 20 out of 24 hours a day, that he was "wet and dirty sometimes," and that he was "wasting away in a urine-soiled bed."

On November 11, 2011, Dr. Maynard examined Mr. Shafer and completed a Physician's Report (dated December 8, 2011), stating that based on his November 11, 2011 examination, Mr. Shafer "is not able to make decisions in his own best interest," and "would not be able to appear in court" because "his Parkinson's Disease and dementia would prevent any meaningful responses from the patient."

The disagreement between Ms. Knight and Ms. Shafer over Mr. Shafer's care came to a head on November 19, 2011. That evening, while the other nursing home residents were at dinner, Ms. Booker, Mr. Shafer's other daughter Lisa and her husband, and Ms. Knight's now ex-husband carried Mr. Shafer out of the nursing home and brought him to Ms. Knight's house to live. The nursing home provided Home Discharge Instructions which reflected that he was on nineteen medications, at least three of which were psychotropic drugs – including Exelon, Seroquel, and Xanax[3] – meaning "capable of affecting the mind, emotions, and behavior."[4]

That same day, after Mr. Shafer left the nursing home, the nursing home administrator called the Terre Haute Police Department to report that Mr. Shafer "was missing from his room

---

[3] http://www.dhs.wisconsin.gov/rl_dsl/MedManagement/psychMeds.pdf.

[4] http://www.medicinenet.com/script/main/art.asp?articlekey=30807.

6

and was not located in the building" and that other residents advised her that "they had seen [Mr. Shafer] being carried from the building by the family." The administrator advised the Terre Haute Police Department that "they had a paper from Dr. Steven Maynard stating that as of February 2011 James was not capable of making decisions on his own behalf," and that other family members had advised her that he was at Ms. Knight's house. The Terre Haute Police Department visited Ms. Knight's house and noted the following in the Crime/Incident Report:

> Upon our arrival we located the residence and spoke with [Ms. Knight] along with other family members. They said [Mr. Shafer] was inside the residence and wanted to stay there. She said [Mr. Shafer] was able to make decisions for himself and that they wanted him there and would take care of his needs….[W]e asked to speak with James. I asked him several questions (IE date, where he was, who people were, where he had been…) and found that for an 80 year[] old he knew what he wanted.
>
> Sgt. Wallace called Capt. Green to get his opinion and we agreed since he was an adult and was capable of making his own decisions it would be up to him. We asked him if he wished to stay with his daughter and he answered "yes".…[We] then told him that he could stay and he broke down and cried.

Mr. Shafer was seen by Dr. Maynard at his office two days later, on November 21, 2011. Dr. Maynard noted that Mr. Shafer was living with Ms. Knight, and that "since being w/ daughter [he] has noticed a dramatic improvement in terms of strength." Mr. Shafer wanted "clarification on current medications," and Dr. Maynard noted that "[h]e's had a stormy course going to multiple psychotropic drugs which apparently caused an extruder mild sedation." Dr. Maynard categorized Mr. Shafer's Alzheimer's Disease and Parkinson's Disease as "improved," and adjusted his medications. Dr. Maynard later memorialized his findings during the November 21, 2011 exam in a letter in which he stated "Mr. Shafer's memory had shown an improvement from previous evaluations. Mr. Shafer is capable of choosing his own power of attorney."[5]

---

[5] The Court acknowledges that Dr. Maynard had previously opined that Mr. Shafer was not capable of making decisions on his own behalf in a Physician's Report reflecting his findings during a

On November 23, 2011, a detective from the Terre Haute Police Department visited Ms. Knight's residence for further investigation. In his Supplemental Report, the detective stated:

> I went to Rhonda's residence and spoke with her, her husband and Mr. Shafer. Rhonda gave me a copy of a large amount of notes and we reviewed what had happened to bring him to her residence. When I first walked in and during my lengthy discussion with the family I observed that the house was clean, well kept, and warm. Mr. Shafer had his own bedroom, a comfortable chair to sit in and his wheelchair accessible. I spoke to Mr. Shafer and he said that he was there of his own free will and that is the place he wants to be. I told him that the police department would not be removing him from the house because there was no criminal activity and he shook my hand, more than once, thanked me several times and cried, saying he was so happy he could stay there. He said that he wants to divorce his wife….I felt that Mr. Shafer was well cared for at Rhonda's residence and he wants to stay there. Mr. Shafer seemed clear headed and answered my questions fully with no confusion while he and I spoke.

On November 27, 2011, Mr. Shafer went to the emergency room for "acute dizziness." Dr. Andreasen stated that Mr. Shafer "became acutely dizzy [which] lasted for a few minutes and resolved but then he started falling to the side." Dr. Andreasen stated "[t]hrough the night he has improved. He has no more dizziness this morning and he seems to be back to his baseline standard by the family…." The next day, Dr. Andreasen noted "[o]n physical examination he was very alert, [and] very lucid…He followed commands fairly well. He went through all of this however very slow. There was no focal weakness….I agree with attending physician. The patient will go back to home with extensive health care help at home."

Mr. Shafer had a CT scan on November 29, 2011, and the report stated that he had "[d]iffuse chronic white matter microvascular ischemic changes/demyelination. No acute

---

November 11, 2011 examination. The Court notes, however, that Dr. Maynard's finding during the November 21, 2011 visit that Mr. Shafer's cognitive abilities had improved and that he was capable of choosing his power of attorney coincided with Mr. Shafer's removal from the nursing home and adjustment of his medications.

intracranial hemorrhage or mass effect is seen. If clinically indicated, consider MRI for further evaluation."

### D. Power of Attorney and Change of Beneficiary

On December 6, 2011, Anjie Hall, a social worker with Vigo County Adult Protective Service,[6] visited Mr. Shafer at Ms. Knight's house. She found Mr. Shafer to be alert and oriented. Mr. Shafer discussed golfing and his family, including his children, and stated that he did not want to talk to Ms. Shafer or visit with her. Ms. Hall memorialized her findings from the December 6, 2011 meeting in a letter in which she stated:

> Adult Protective Service visited Mr. James Shafer at [his] daughter Rhonda Knight's home on Dec. 6, 2011. Adult Protective Service found Mr. Shafer to be alert and oriented and able to answer all questions appropriately. Adult Protective Service asked Mr. Shafer, on that date, if he wanted to visit with his wife and he stated he did not want to see his wife nor talk to her. Mr. Shafer stated he wanted to live with his daughter Rhonda Knight at her house. Mr. Shafer discussed with Adult Protective Service that he was going to make Rhonda his Power of Attorney and that they were going to do so on Dec. 6, 2011.

Also on December 6, 2011, after Ms. Hall visited Mr. Shafer, he signed a Durable Power of Attorney (the "Power of Attorney") which gave Ms. Knight power of attorney authorizing her to, among other things, "manage and conduct all of my affairs and to exercise all of my legal rights and powers, including all rights and powers that I may acquire in the future…includ[ing], but not limited to, the power to…[a]dd, delete or change beneficiaries to any financial accounts I own including insurance policies, annuities, retirement accounts, payable on death savings or checking accounts or other investments." The Power of Attorney is signed by two witnesses, Karin Martinek and Angela Montgomery. The Power of Attorney also specified that Lisa Marlene Lugabihl was the back-up attorney-in-fact under the Power of Attorney.

---

[6] Ms. Hall has been a social worker with Adult Protective Service for nine years, and has received job-related training from the State of Indiana.

9

John Crapo, the owner of an insurance agency and a licensed notary, notarized the Power of Attorney. Mr. Shafer had worked with Mr. Crapo's father for several years, and Mr. Crapo chatted with Mr. Shafer and found him to be lucid and understanding of what he was signing. Mr. Crapo later memorialized his interactions with Mr. Shafer in a letter, in which he stated "James A. Shafer came into my office on December 6, 2011 with his daughter, Rhonda Knight, to have a document notarized. I notarized a Power of Attorney form that Mr. Shafer signed, naming Rhonda Knight as his power of attorney. During the course of our business, I spoke with Mr. Shafer. He was mentally alert and I was satisfied that he understood what he was signing."

On December 8, 2011, Ms. Knight, acting as Mr. Shafer's attorney-in-fact, revoked Mr. Shafer's designation of Ms. Shafer as the primary beneficiary under the Plan, and changed herself to be the primary beneficiary. Mr. Shafer accompanied Ms. Knight to his former employer, and met with the human resources representative, to effectuate the beneficiary change. His hands were shaking badly, so he asked the human resources representative if Ms. Knight could sign the beneficiary change form on his behalf, and the human resources representative responded that she could because the Power of Attorney gave her the right to do that, and because the human resources representative was present.

On December 9, 2011, Mr. Shafer had a CT scan and Dr. Hubbard noted "[n]o acute intracranial findings. Age related atrophy. Moderate degree of cortical chronic microvascular white matter ischemic change."

On January 4, 2012, Mr. Shafer was examined by Dr. Andreasen at his office. Dr. Andreasen stated "James A. Shafer presents today for followup of his asymptotic heart disease with hypertension and atrial fibrillation. He also has cerebrovascular disease and Parkinson's disease. He is doing much better now that his daughter is taking care of him. He seems to get

consistent medication and she gets up with him at night without having to give medication to sleep, like at the nursing home. Overall he seems much more alert and answers questions appropriately….” Mr. Shafer saw Dr. Maynard on January 5, 2012 for his memory issues. Dr. Maynard noted that he "is doing much better….He is living with his daughter…[M]entally he is doing much better. He participates much more in conversations." Dr. Maynard stated "Mental status has significantly improved. Behavior has dramatically improved as well…." He memorialized his impressions from the January 5, 2012 examination in two letters, stating "Mr. Shafer's memory had shown an improvement from previous evaluations," "Mr. Shafer is capable of making decision[s] concerning his [marital] status," Mr. Shafer's "memory had shown an improvement from the previous evaluation in September," and he "is capable of making his own decisions concerning everyday living."

### E. Mr. Shafer Initiates Divorce Proceedings

On January 19, 2012, Mr. Shafer signed and filed a Verified Petition for Dissolution of Marriage with the Vigo County, Indiana Superior Court. He also filed a letter stating that Ms. Knight was typing the letter as his power of attorney because he was unable to, but "the words are mine," and that he would like a divorce, and requesting that the court allow Ms. Knight to appear in court for any proceedings on his behalf.

On February 12, 2012, Mr. Shafer was admitted to the hospital for swelling in his lower extremities, arms, and face and an increased cough and chest congestion with shortness of breath. Dr. Andreasen noted that Mr. Shafer "has his Parkinson's disease which has been stable," that there were "[n]o neurologic findings other than his general stiffness from his Parkinson's disease," and that he had "[n]o psychiatric complaints with a bright mood and he answers appropriately."

During the midst of Mr. Shafer's additional medical treatment, Ms. Shafer wrote a letter to the judge presiding over the divorce proceeding, stating that she did not want the divorce, enclosing some medical records relating to Mr. Shafer's care, outlining her wishes regarding their finances, and concluding by stating "Also James can speak for himself in this matter and doesn't need [Ms. Knight] to speak for him." This statement is significant as it reflects Ms. Shafer's view as to Mr. Shafer's competency, and is contrary to her steadfast position at trial that Mr. Shafer was continually incompetent from September of 2011 until his death.

Dr. Andreasen examined Mr. Shafer on March 30, 2012 for lower leg pain, and noted "[n]eurologically he continues to thrive. He is much more alert and his Parkinson symptoms are doing well. He walked 125 feet today with a walker. When asked, he is happy with his living situation and wishes to continue to live with his daughter. When asked if he would like to finalize his divorce he says yes. He seems more alert and lucid than he has been in the last several years." Dr. Andreasen also noted that Mr. Shafer's Parkinson's symptoms and dementia were "greatly improved."

### F. The Divorce is Finalized

On April 9, 2012, a final hearing was held in Vigo Superior Court and the divorce was finalized. Mr. Shafer appeared in person, *pro se*, at the final hearing.

Dr. Maynard wrote a letter on April 11, 2012, noting that Mr. Shafer's score on a Mini Mental Status Exam had steadily improved and that "[t]he evaluations have shown Mr. Shafer to have a steady progression in his neurological functions." Medical records from later that year – specifically, from July 31, 2012, September 17, 2012, September 23, 2012, December 28, 2012, December 29, 2012, and May 9, 2013 – show some decline in Mr. Shafer's health related to his Alzheimer's Disease and Parkinson's Disease.

### G. Claims to the Plan Benefits

After his long illness, Mr. Shafer died on May 23, 2013 at Ms. Knight's house. On June 3, 2013, Ms. Knight submitted a completed Claimant's Statement in which she claimed to be the beneficiary of the Plan Benefits. On June 26, 2013, Ms. Shafer submitted a letter to MetLife stating that she is the "sole beneficiary of my late husband's life ins policy." Ms. Knight submitted a letter to MetLife on July 13, 2013, again claiming that she is the beneficiary of the Plan Benefits.

## II.
### CONCLUSIONS OF LAW

ERISA defines a "beneficiary" as "a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder." 29 U.S.C. § 1002(8). The Plan here provides:

> You may designate a Beneficiary in Your application or enrollment form. You may change Your Beneficiary at any time. To do so, You must send a Signed and dated, Written request to the Policyholder using a form satisfactory to Us. Your Written request to change the Beneficiary must be sent to the Policyholder within 30 days of the date You Sign such request.
>
> You do not need the Beneficiary's consent to make a change. When We receive the change, it will take effect as of the date You Signed it. The change will not apply to any payment made in good faith by Us before the change request was recorded.

[Filing No. 1-1 at 49.]

The Plan here specifically provided that Mr. Shafer could change the beneficiary by submitting a written request on a form satisfactory to the Plan administrator. [Filing No. 1-1 at 49.] Ms. Shafer does not challenge the form submitted by Ms. Knight, for example by arguing that it was not signed or dated. Her argument is based on her belief that Mr. Shafer was not competent to execute the Power of Attorney, so the change of beneficiary was not valid since Ms. Knight used the Power of Attorney to accomplish that change. The Court considers this issue in

13

two steps: first, whether Mr. Shafer was competent to execute the Power of Attorney and, second, whether Ms. Knight could use the Power of Attorney to change the beneficiary.

### A. Whether the Power of Attorney Was Valid

The Court looks to Indiana law to determine whether Mr. Shafer was competent to execute the Power of Attorney. This execution took place outside of the ERISA context, and is governed by Indiana common law. "The test for determining a person's mental capacity…is whether the person was able to understand in a reasonable manner the nature and effect of his act….In order to avoid [the consequences of the act], the party must not only have been of unsound mind, but also must have had no reasonable understanding of the contract's terms due to his instability." *Gallagher v. Central Indiana Bank, N.A.*, 448 N.E.2d 304, 307 (Ind. Ct. App. 1983). The Court must also consider whether Mr. Shafer was unduly influenced to execute the Power of Attorney. Under Indiana law, the relationship of a parent and child is considered a "confidential" one, such that there is "a presumption of trust and confidence as to the subordinate party on the one side and a corresponding influence as to the dominant party on the other." *Supervised Estate of Allender v. Allender*, 833 N.E.2d 529, 533 (Ind. Ct. App. 2005). Where the dominant party benefits from the transaction, there is a presumption of undue influence that the dominant party must rebut by clear and convincing evidence that the dominant party "acted in good faith, did not take advantage of [the] position of trust, and that the transaction was fair and equitable." *Carlson v. Warren*, 878 N.E.2d 844, 851 (Ind. Ct. App. 2007) (citations and quotations omitted). Although it is not clear that such a presumption would arise here, where Ms. Knight is the child and Mr. Shafer the parent, the Court will analyze the undue influence factor under that rubric given Mr. Shafer's health and Ms. Knight's position as his caregiver.

The Court has considered testimony from witnesses, any preparation or documentation reflecting Mr. Shafer's desires, and any evidence suggesting that Mr. Shafer understood the consequences of his actions. *See In re Estate of Compton*, 919 N.E.2d 1181, 1188 (Ind. Ct. App. 2010) (in determining whether individual was competent to execute legal document effectuating sale of farmland, court considered evidence that individual was "one to make up his own mind, to do his own thing, knowing his own mind, being strong willed, and not subject to being bullied or pushed," that he independently inquired into value of his farmland and commented on selling it, and that he was "aware and alert while hospitalized").

The Court finds that Mr. Shafer was fully competent to execute the Power of Attorney because he understood the nature of his action and the effect of that action, and that Ms. Knight has sustained her burden of rebutting the presumption of undue influence by clear and convincing evidence. Ms. Shafer repeatedly stated at trial that there was no cure for Mr. Shafer's Alzheimer's Disease or Parkinson's Disease, and so he could not have been competent to execute the Power of Attorney once he was diagnosed with those diseases. But Ms. Shafer also acknowledged that Mr. Shafer had good and bad days, and even stated in her February 21, 2012 letter to the judge presiding over the divorce proceeding – written over two months after Mr. Shafer signed the Power of Attorney – that Mr. Shafer "can speak for himself in this matter and doesn't need [Ms. Knight] to speak for him."

Mr. Shafer's competency, and the lack of any undue influence, is corroborated by many other sources, including:

- The initial and follow-up reports from the Terre Haute Police Department following Mr. Shafer leaving the nursing home, in which officers stated that they found Mr. Shafer "knew what he wanted," that he was emotional and grateful when he learned he could remain at Ms. Knight's house, that he said he was at Ms. Knight's house "of his own free will and that is the place he wants

15

to be," and that he "seemed clear headed and answered…questions fully with no confusion….";

- John Crapo, who found Mr. Shafer to be lucid and "mentally alert" when he signed the Power of Attorney, and noted that he "was satisfied that [Mr. Shafer] understood what he was signing";

- Anjie Hall, who visited Mr. Shafer the day he signed the Power of Attorney on behalf of Vigo County Adult Protective Service and noted that she found him "to be alert and oriented and able to answer all questions appropriately," that Mr. Shafer said he wanted to live with Ms. Knight, and that he "discussed with Adult Protective Service that he was going to make [Ms. Knight] his Power of Attorney and that they were going to do so on Dec. 6, 2011"; and

- Dr. Maynard's various notes and letters finding that Mr. Shafer's neurological condition greatly improved when he moved in with Ms. Knight, and that he was capable of choosing his own power of attorney, and making decisions regarding his marital status and his everyday living.

The evidence overwhelmingly shows that Mr. Shafer intended to make Ms. Knight his power of attorney, and understood the consequences of doing so. While Ms. Shafer repeatedly asserted her suspicion that Mr. Shafer was unduly influenced by Ms. Knight and his other children, she acknowledged that she had no actual evidence that such was the case. Instead, the evidence indicates that Ms. Knight and her siblings were motivated by a desire to make their father comfortable and well-cared-for, as they believed he was being both overmedicated and undernourished in the nursing home. No evidence suggests an untoward motivation in removing him from the nursing home and subsequently acting under the Power of Attorney. And, importantly, Mr. Shafer's competency and freedom from any undue influence is supported by many independent sources, including Terre Haute Police Department officers, Mr. Crapo, and Ms. Hall (whose position as a social worker for Adult Protective Service makes her opinion that Mr. Shafer was fully competent and wanted to execute the Power of Attorney particularly powerful). Finally, the records establish that Mr. Shafer's objective symptoms improved dramatically once

16

he moved in with Ms. Knight, though he ultimately succumbed to the diseases from which he suffered.

The Court finds that Mr. Shafer was competent when he executed the Power of Attorney, and that Ms. Knight has shown by clear and convincing evidence that Mr. Shafer was not under undue influence when he did so. Accordingly, the Court finds that the Power of Attorney is valid.

### B. Whether the Power of Attorney Operated to Change the Beneficiary

Next, the Court considers whether the Power of Attorney validly changed the beneficiary of the Plan Benefits. The Plan is governed by ERISA, but "ERISA does not contain any provisions governing disputes between claimants to plan proceeds, or addressing whether an insured has effectively changed a beneficiary designation." *Metropolitan Life Ins. Co. v. Johnson*, 297 F.3d 558, 564 (7th Cir. 2002) (citing *Phoenix Mut. Life Ins. Co. v. Adams*, 30 F.3d 554, 559 (4th Cir. 1994)). As was the case for determining whether Mr. Shafer was competent to execute the Power of Attorney, under Indiana law relating to whether the beneficiary change was valid, Ms. Knight would have the burden of rebutting the presumption of undue influence by clear and unequivocal evidence since she used the Power of Attorney to change the beneficiary to herself. *Carlson*, 878 N.E.2d at 851. The question, though, is whether ERISA preempts this state law.

ERISA will preempt state law "insofar as [the state law] may now or hereafter relate to any employee benefit plan" subject to ERISA. 29 U.S.C. § 1144(a). The Supreme Court has found that a state law "relates to" an ERISA plan if it has: (1) a connection with or (2) reference to such a plan. *California Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 324, 117 S.Ct. 832, 136 L.Ed.2d 791 (1997). "A state law has 'reference to' an ERISA plan where it 'acts immediately and exclusively upon ERISA plans,…or where the existence of ERISA plans is essential to the law's operation." *Johnson*, 297 F.3d at 564. Because Indiana's

17

common law relating to the presumption of undue influence would relate generally to life insurance policy beneficiary designations, and not just those governed by ERISA, the common law does not have "reference to" an ERISA plan such that it would automatically be preempted. *Id.* The Seventh Circuit Court of Appeals has held, however, that "a state law affecting the designation of a beneficiary is sufficiently 'related to' an ERISA plan such that a state law doctrine of substantial compliance is preempted by ERISA." *Id.* at 566; *see also MacLean v. Ford Motor Co.*, 831 F.2d 723, 727-28 (7th Cir. 1987) (ERISA preempted state law where Indiana testamentary transfer law, if applied, would determine proper beneficiary of pension plan). Here, because Indiana common law would affect the Court's determination of whether the beneficiary designation was valid, the Indiana common law is sufficiently "related to" an ERISA plan such that Indiana state law is preempted.

As noted above, ERISA is silent regarding whether an insured has effectively changed a beneficiary designation. ERISA does instruct courts, however, to strictly enforce the terms of plans. 29 U.S.C. § 1104(a)(1)(D). The Seventh Circuit Court of Appeals has found that "[i]n circumstances where a plan provides liberal mechanisms for changing beneficiaries…, 'strict' enforcement means allowing participants to do exactly that." *Riordan v. Commonwealth Edison Co.*, 128 F.3d 549, 552 (7th Cir. 1997). In such a case, "the documents control." *Id.* (citing *McMillan v. Parrott*, 913 F.2d 310, 312 (6th Cir. 1990)).

Under the federal common law of ERISA, a power of attorney should be strictly construed, and courts will look to the specific powers the power of attorney grants. *See Clouse v. Philadelphia, Bethlehem & New England Railroad Co.*, 787 F.Supp. 93, 98 (E.D. Penn. 1992) (holding general power of attorney that did not specifically address the power to change beneficiaries was not effective to change an ERISA beneficiary). Here, the Power of Attorney

18

specifically gave Ms. Knight the power to "[a]dd, delete or change beneficiaries to any financial accounts I own including insurance policies, annuities, retirement accounts, payable on death savings or checking accounts of other investments." [Filing No. 1-2 at 1.]  Federal courts have upheld such beneficiary changes made through powers of attorney which specifically grant that power.  See Sanford v. TIAA-CREF Individual & Institutional Services, LLC, 2014 WL 1311827, *10 (N.D. N.Y. 2014) (beneficiary designation made through power of attorney which specifically granted authority to change the beneficiaries of an ERISA plan validly changed the beneficiary of that plan); Taylor v. Kemper Financial Services Co., 1999 WL 782027, *2 (N.D. Ill. 1999) ("the power of attorney did not 'reflect the clear and obvious intent' to grant [the agent] the power to change beneficiaries…so [the agent] did not have that authority").  Accordingly, under federal common law, the Power of Attorney here was properly used to change the beneficiary of the Plan Benefits from Ms. Shafer to Ms. Knight.

In sum, the Power of Attorney was valid and specifically gave Ms. Knight the power to change the Plan's beneficiary on Mr. Shafer's behalf.  Under ERISA, the Power of Attorney was properly used to change the Plan beneficiary from Ms. Shafer to Ms. Knight, and Ms. Knight is entitled to the Plan Benefits.

## III.
### CONCLUSION

For the foregoing reasons, the Court finds that Ms. Knight is entitled to the Plan Benefits.  The Court **ORDERS** the Clerk to remit to Ms. Knight the $10,004.73 paid into the Clerk by MetLife, together with any interest that has accrued while the funds were in the Clerk's custody.  Final judgment will enter accordingly.

November 4, 2014

_Jane Magnus-Stinson_
Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via U.S. Mail to:**

Eleanor Shafer
5235 E. Greenbriar Dr. #19
Terre Haute, IN 47802

Rhonda L. Knight
2200 Garfield Ave.
Apt. 721
Terre Haute, IN 47804

**Distribution via ECF only to counsel of record**